UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

VALERIE L. SIEG,

                    Plaintiff,

          v.                                              Case No. 20-C-1420

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                    Defendant.

## DECISION AND ORDER OF DISMISSAL

Plaintiff Valerie Sieg commenced this action against Defendant Hartford Life and Accident Insurance Company, alleging that Hartford violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, by denying her long-term disability (LTD) benefits. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Presently before the Court is Sieg's motion for judgment on the administrative record. Dkt. No. 19. Having reviewed the administrative record, the Court concludes that Hartford's denial of benefits was not arbitrary and capricious. Sieg's claim for benefits is therefore denied and the case dismissed.

## BACKGROUND

For four years, Sieg worked as a senior branch office administrator in the Appleton office of Edward Jones, a financial services and advisory firm. AR 1910–11. As an employee of Edward Jones, Sieg participated in Edward Jones' group LTD plan (the Plan). AR 2004–57. The Plan was both fully insured and administered by Hartford. *Id.* To receive LTD benefits under the Plan, a claimant must first be determined to be "disabled" within the meaning of the Plan.

The degree of impairment required for a finding of disability under the Plan increases over time. The Plan states, "Disability or Disabled means You are prevented from performing one or more of the Essential Duties of: (1) Your Occupation during the Elimination Period; (2) Your Occupation, for the 2 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and (3) after that, Any Occupation." AR 2036. "Any Occupation" is defined as "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: (1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or (2) the Maximum Monthly Benefit." AR 2035. An "Essential Duty" is any duty that (1) "is substantial, not incidental;" (2) "is fundamental or inherent to the occupation;" and (3) "cannot be reasonably omitted or changed." AR 2036. The Plan also notes that an employee's "ability to work the number of hours in Your regularly scheduled work week is an Essential Duty." *Id.*

The Plan caps the duration of disability benefits at 24 months if the participant is disabled because of "Mental Illness" or "Substance Abuse." AR 2028. The Plan provides, "If you are Disabled because of: 1) Mental Illness that results from any cause; 2) any condition that may result in Mental Illness; 3) alcoholism which is under current treatment; . . . then, subject to all other provisions of The Policy, We will limit the Maximum Duration of Benefits." *Id.*

In August 2016, Sieg reduced her hours, citing health reasons, and ceased work entirely on October 17, 2016. On January 31, 2017, she submitted a claim for long term disability benefits. On February 1, 2017, Sieg submitted an Attending Physician's Statement of Functionality signed by her internist, Jack Anderson, M.D., who listed the primary diagnoses as fibromyalgia and degenerative joint disease, the secondary diagnosis as depression, and subjective symptoms of "chronic neck/back pain." AR 1772. On February 27, 2017, Sieg submitted an Attending

2

Physician Statement signed by her neuropsychiatrist, Gerald Bannasch, M.D. AR 1686–87. Dr. Bannasch listed his primary diagnosis as "Major Depressive Disorder," with a secondary condition of "Chronic Pain" and "Sleep Disturbance." AR 1686. Hartford approved Sieg's long term disability claim under the Plan's 24-month "Your Occupation" definition of disability for the period from April 17, 2017, to April 16, 2019. AR 133–35, 283–90.

On August 1, 2018, Hartford informed Sieg that it was reviewing her claim to determine if she would continue to qualify for LTD benefits beyond April 16, 2019, under the Plan's "Any Occupation" definition of disability. AR 245–46. As part of its review, Hartford hired Siva Ayyar, M.D., M.P.H., to conduct a file review for Sieg's claim. AR 922–32. Based on his review of Sieg's medical records, Dr. Ayyar issued a report in which he concluded to a reasonable degree of clinical probability that Sieg had no continuous or time-based biomedical limitations. AR 925. In the absence of any such limitations, Dr. Ayyar concluded that Sieg "should, thus, be considered unlimited and unrestricted from a medical (physical) perspective and, by implication, capable of performing full-time work and/or nonwork activities in an unlimited and unrestricted fashion, at a minimum rate of 8 hours a day, 5 days a week, and/or 40 cumulative hours per week, without any formal limitations in place." *Id.* On June 7, 2019, Hartford advised Sieg that it determined Sieg did not meet the policy definition of "disability" beyond April 16, 2019, because she was "not prevented from performing the essential duties of Any Occupation." AR 192–98. Based on its own review of the file and Dr. Ayyar's report, Hartford determined that Sieg did not qualify for long term disability benefits under the Plan. AR 192.

Sieg appealed Hartford's decision on March 10, 2020. AR 732–51. She submitted additional documentation to support her claim, including office visit notes from various physicians, her Social Security claim file, an affidavit, and information regarding fibromyalgia.

3

*Id.* Because it appeared that the decision granting Sieg's application for disability benefits under the Social Security Act was based not on her alleged physical impairments but instead on her mental impairments, Hartford wrote Sieg's attorneys asking for more information about her psychiatric condition. Sieg declined Hartford's request. Her attorney's letter in response noted that Sieg "does not wish to pursue a claim on the basis of her psychiatric conditions." AR 354. Although counsel asserted that Sieg had been diagnosed with depression and anxiety, counsel contended that "these conditions are caused by and secondary to her physical conditions, including, inter alia, fibromyalgia, cervical and lumber disc degeneration, IBS, and small fiber neuropathy." *Id.* In refusing to provide such information and explicitly denying that her alleged disability was due to mental illness, Sieg thereby avoided the 24-month cap on benefits for disabilities caused by mental illness or substance abuse.

Hartford hired Ira Weisberg, M.D., to conduct a file review of Sieg's claim. AR 395–403. Dr. Weisberg conducted a review of the medical file and concluded that Sieg "does have the ability to work full-time" on a regular basis with the following limitations:

> • Sit constantly (2hrs. at a time for up to 6 hrs. total)
> • Stand, walk, occasionally (30 min. at a time for up to 2 hrs. total)
> • Lift, carry, push, pull 20 lbs. rarely (15 min. at a time for a total of 1 hr.). 10 lbs. occasionally (30 min. at a time for up to 2 hrs. total)
> • Reach above and below: occasionally (0-2.5hrs.) reach at waist/desk level; constantly (2 hrs. at a time for up to 6 hrs. total)
> • Finger, simple and firm grasp, fine and gross manipulation constantly (2 hrs. at a time for up to 6 hrs. total)
> • Bend, crouch, stoop occasionally (30 min at a time for up to 2 hrs. total)
> • Kneel, crawl, climb, balance, use of foot controls; frequently (1 hr at a time for up to 4 hrs. total)
> • Allowed to stand and stretch
> • Allowed to be located near a restroom.

AR 401–02. Hartford then referred Sieg's file to a vocational case manager to determine whether Dr. Weisberg's findings would change the results of the original employability analysis dated June

4

4, 2019. AR 364–66. The vocational case manager concluded that, with the updated restrictions and limitations, Sieg would be able to perform seven occupations, including charge-account clerk; order clerk, food and beverage; correspondence clerk; dispatcher, maintenance service; dispatcher, street department; hospital-admitting clerk; and clerk, general. *Id.*

On May 5, 2020, Hartford upheld its initial determination to terminate benefits. AR 175–81. Hartford concluded that Sieg does not meet the Policy definition of "Disability for Any Occupation," as the medical evidence indicates that she could at least perform at the full-time sedentary to light level of function as of April 16, 2019, from a physical standpoint and various alternative gainful occupations had been identified that she could perform within her functional abilities. AR 180. It noted that Sieg claimed inability to perform "Any Occupation" as of April 16, 2019, forward due to symptoms related to fibromyalgia, leukopenia, degenerative disc disease of the cervical and lumbar spine, irritable bowel syndrome, sleep apnea, high blood pressure, and small fiber neuropathy, as well as adverse effects from medications. AR 177. Hartford explained that, based on its review of all of the evidence contained in the claim file, the independent medical review by Dr. Weisberg, and the revised employability analysis, it determined the claim decision was correct. AR 176–77. It summarized the findings of Sieg's medical providers and found that their opinions were either outdated or inconsistent with the evidence in the record. AR 178. Hartford acknowledged that, while Sieg could experience symptoms related to her various conditions and some of those symptoms may impair or interfere with her ability to perform certain tasks, the evidence indicated that Sieg's residual level of function is consistent with the ability to perform at least within the full-time sedentary to light level of function as of April 16, 2019. *Id.* It explained further that being diagnosed with a condition or multiple conditions and the need for ongoing treatment does not necessarily support inability to function or work during any particular

5

period of time. AR 179. Hartford noted that it is possible to qualify for Social Security Disability benefits but no longer continue to qualify for private LTD benefits because the standards governing receipt of public and private benefits are critically different. *Id.*

For these reasons, Hartford concluded that the termination of Sieg's claim for benefits was appropriate and upheld its determination on administrative appeal. AR 180. With the Plan's administrative remedies exhausted, Sieg filed the action for judicial review.

## LEGAL STANDARD

"A denial of benefits normally is reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "In such a case, the denial of benefits is reviewed under an 'arbitrary and capricious' standard." *Id.* (quoting *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007)). Here, the parties agree that the Plan vests Hartford with discretionary authority and that the arbitrary and capricious standard applies.

"Under the arbitrary and capricious standard, the reviewing court must ensure only that a plan administrator's decision 'has rational support in the record.'" *Id.* (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Id.* (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). "However, '[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject.'" *Id.* (quoting *Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003)). "Nevertheless, we will uphold the plan's decision 'as long as (1) it is possible to offer a reasoned

6

explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Id.* (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (internal quotations omitted)). "The court must also be mindful of the conflict of interest that can exist when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Des Armo v. Kohler Co. Pension Plan*, No. 13-C-436, 2014 WL 3860049, at *5 (E.D. Wis. Aug. 6, 2014) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). The Court must "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," and the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 544 U.S. at 108.

## ANALYSIS

Sieg argues that Hartford "ignored evidence" of her severe impairments and "cherry-picked" the evidence in the record to find that she did not meet the Plan's definition of "disability." Dkt. No. 20 at 7, 13. Sieg cites medical records that she believes support her allegations of severe pain and limited physical functioning. She suggests that Hartford's decision making was arbitrary and capricious because it had previously concluded "on multiple occasions that she was unable to perform her own, sedentary occupation or any other occupation." *Id.* at 13. But the fact that Hartford initially approved Sieg's application for benefits does not change the calculus with respect to whether Hartford ignored the evidence provided by Sieg. While previous payment of benefits is one factor for the Court to consider in its analysis, a plan's previous payment of benefits does not operate "forever as an estoppel so that an [administrator] can never change its mind."

7

*Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823 (7th Cir. 2009) (internal quotation marks and citation omitted). Hartford, as the plan administrator, "is entitled to seek and consider new information and, in appropriate cases, to change its mind." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 767 (7th Cir. 2010).

Other than her contention that the evidence she provided establishes that she is disabled, Sieg offers nothing to suggest that Hartford ignored evidence of her severe impairments. Hartford explicitly stated in its decision that it reviewed Sieg's entire administrative file and the additional documents submitted on appeal. Sieg asserts that the restrictions and limitations identified by her medical provider, Dr. Anderson, as well as the statements of Dr. Bannasch and Dr. Gowing, support that she lacks the capacity to perform even sedentary work and that Hartford offered a "cursory explanation" for rejecting the opinions of Sieg's medical providers. While plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," administrators need not "accord special weight to the opinions of a claimant's physician" or carry a "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Dr. Anderson, Sieg's internist, was the only treating physician to identify specific functional limitations. He completed a Medical Assessment questionnaire on November 12, 2018, to support Sieg's claim for social security disability benefits. Dr. Anderson opined that Sieg could stand or walk for only 5 minutes without interruption; sit for a total of one to two hours in an eight-hour day and for only 15 minutes without interruption; carry only two to three pounds occasionally and not even one pound frequently; and never reach, handle, finger, push, or pull. AR 980–82. Dr. Anderson wrote that his assessment and opinion was "based on my questions and her answers

as well as my physical exam demonstrating weakness in many muscle groups accompanied by pain." AR 980. As Hartford points out, however, at the time Dr. Anderson completed the questionnaire on November 12, 2018, there was no record of his having examined Sieg after June 8, 2018. The physical examination he performed at that time documented "[n]o focal motor, sensory, or cerebellar deficits" and "no acute distress." AR 1108. Moreover, if the limitations Dr. Anderson endorsed were accepted as true, Sieg would have been virtually bedridden and incapable of performing even simple activities of daily living.

It is also important to note that Dr. Ayyar called Dr. Anderson on May 8, 2019, to discuss his clinical findings. Dr. Anderson "took no position on the claimant's claim for disability benefits." AR 923. He stated that he had not seen Sieg for six to nine months and was therefore unable to comment on her "abilities, capabilities, and day-to-day functionalities." *Id.* Dr. Anderson further explained that he deferred to the positions of the psychiatrist, physiatrist, and rheumatologist Sieg was seeing, and while he had filled out some claim forms and written letters on behalf of Sieg, he was hesitant to continue doing so given how infrequently he was seeing her. *Id.* Yet, on June 9, 2019, only two days after Hartford initially denied Sieg's disability claim, Dr. Anderson completed a Hartford questionnaire. AR 555–57. He opined that Sieg "is not capable of part time work" due to her "achy muscles, neck and back pain." AR 556. Although Dr. Anderson noted in the questionnaire that his last office visit with Sieg occurred on June 7, 2019, neither Dr. Anderson nor Sieg submitted those medical record and exam findings to Hartford.

Sieg asserts that Dr. Anderson's opinions are supported by the findings of her other physicians. Dr. Bannasch, Sieg's neurologist and psychiatrist, submitted a letter to Hartford on September 9, 2019, in which he opined that Sieg is "totally and completely disabled from any gainful employment." AR 558. He noted:

9

> She has had a fibromyalgia type of disorder which has made her depressive disorder extremely difficult to treat and control. She is in constant pain from the fibromyalgia and this constant pain will disrupt her [sic] ability to sleep and get a restorative sleep. This, in turn, will affect the patient's cognition during the waking hours and cause her to feel more dysphoric and depressed. The patient, because of this sleep disturbance, will have more difficulty with mood and depression, and her fatigue will be increased. The sensation of pain from the fibromyalgia will be increased and cause further disability in the fact that she will not be able to move very well.

*Id.* In addition, Dr. Gowing, Sieg's rheumatologist, stated in a July 2019 treatment note that Sieg was "unable to maintain employment in a sedentary position." AR 527. Sieg maintains that this evidence supports that she meets the Plan's definition of disability.

Hartford thoroughly explained why it did not find the opinions of her treating physicians reliable. R. 177–78. It acknowledged that Dr. Anderson supports Sieg's inability to work due to symptoms related to fibromyalgia and neck/back/soft tissue pain that limit her ability to sustain even part-time work and her ability to lift; that Dr. Gowing noted that Sieg is unable to work due to fibromyalgia symptoms and neck and back pain; and that Dr. Bannasch supports Sieg's inability to work due to the combination of depressive disorder, organic mood disorder, fibromyalgia, and C-reactive protein. AR 178. Hartford nevertheless found that the opinions of Sieg's treatment providers were either outdated or inconsistent with the evidence in the record. As to Dr. Anderson, it stated that, even though Dr. Anderson opined that Sieg is unable to perform even part-time work, no updated medical evidence was included to support the opinion. It noted that the most recent office notes available in the claim file were from June 2018. *Id.* Hartford noted that Dr. Gowing's updated records from April 9, 2019, through December 31, 2019, document Sieg's general complaints of pain throughout her body and of fatigue and indicated that Sieg was going to Florida for a month after the December 31, 2019, visit. Hartford found that the exam findings were consistent with mild distress secondary to pain and tenderness throughout the spine, which do not appear to correlate with totally incapacitating function. It also observed that Dr. Bannasch's

updated records from September 20, 2018, through December 27, 2019, document the same exam

findings throughout the office visits, including slow gait/station, decreased cold sensations in the

lower extremities, and muscle fasciculation. Hartford determined that these findings do not appear

to correlate with totally incapacitating function and that Dr. Bannasch's office notes document,

among other things, that Sieg was somewhat improved. *Id.* Hartford also explained that the other

medical evidence in the record, including Dr. Jankus' May 2017 records, Dr. Partian's April and

June 2017 records, and Elizabeth Johnson's August 2018 records were outdated. *Id.* The Court

finds that Hartford provided an adequate explanation for its rejection of the opinions offered by

Sieg's physicians.

Hartford instead relied on the medical reports of the reviewing consultants to support its

determination. Sieg argues that Hartford erred by relying on the "conclusory and unsupported peer

reviews" of Dr. Ayyar and Dr. Weisberg. Dkt. No. 20 at 14. She asserts that the decision to rely

on file reviews, instead of an in-person examination, is one factor that may be considered in

determining whether an administrator's decision was arbitrary and capricious. The Seventh Circuit

has recognized that there is no rule preventing a plan administrator from utilizing the opinions of

independent consulting physicians, even when the physician conducts a file review and does not

physically examine the claimant. *See Davis*, 444 F.3d at 577 ("In such file reviews, doctors are

fully able to evaluate medical information, balance the objective data against the subjective

opinions of the treating physicians, and render an expert opinion without direct consultation. It is

reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save

the plan the financial burden of conducting repetitive tests and examinations.").

Sieg asserts that Dr. Ayyar's conclusions are "absurd and inconsistent with the medical

evidence." Dkt. No. 20 at 16. Dr. Ayyar concluded that the medical evidence did not warrant the

imposition of any restrictions on Sieg, primarily because she did not have "reproducible, objectively verifiable, bona fide motor, musculoskeletal, gait, and/or coordination abnormalities." AR 931. He also noted that diagnostic tests revealed only a paucity of information and that many of Sieg's issues "cannot be definitively attributed to any medical diagnosis or disease process." *Id.*

Given the absence of diagnostic testing to confirm the various diagnoses Sieg carried, Dr. Ayyar's conclusions are not unreasonable. The extreme limitations Sieg's treatment providers found appear to be inconsistent with the fact that, in March 2018, she embarked on a seven-day tropical cruise, AR 1053, in May 2018, she traveled to Niagara Falls, AR 1047, and in 2019, she began spending two to three months during the winter in Merritt Island, Florida, AR 460. Even the Administrative Law Judge (ALJ) who issued the decision granting Sieg's application for social security disability benefits rejected the extreme physical limitations that her doctors endorsed. The ALJ gave Dr. Anderson's opinions "little weight" because he gave Sieg "greater limitations than are supported by her presentation of symptoms or her course of care." AR 414–15. In any event, Hartford did not adopt Dr. Ayyar's conclusions wholesale and acknowledged that Sieg had some limitations. *See* AR 195 ("We have concluded from the combination of all the medical information in your file that you are able to sit frequently, stand/walk as needed, lift/carry up to 10 pounds and frequently use upper extremities."). After Sieg submitted additional evidence to support her claim, Hartford obtained an independent medical opinion from Dr. Weisberg.

Sieg criticizes Dr. Weisberg's report as a "lengthy summary of Sieg's medical records, with very limited analysis of how those records translate into the restrictions that he identified." Dkt. No. 20 at 20–21. She argues that Dr. Weisberg failed to explain how he arrived at the specific restrictions he identified or explain why more extensive restrictions were not supported. *Id.* at 21.

After providing a summary of Sieg's medical history, Dr. Weisberg explained why he found that Sieg had the ability to work full time on a regular basis with certain restrictions. AR 395–403. He noted that more extensive restrictions were not required because Sieg had not seen additional specialists in the last two years to obtain further evaluation of her condition, her exam findings were generally normal and were inconsistent in noting various locations of tenderness, her reporting of her sleep patterns was inconsistent and her Fit Bit showed that her sleep was better than what she described, and the objective studies were normal and unremarkable. Dr. Weisberg nevertheless concluded that Sieg does warrant to be placed on some restriction for April 16, 2019, and beyond primarily based on her MRI findings of her cervical and lumbar spine and her history of previous lumbar surgery. *Id.*

Sieg asserts that Dr. Weisberg ignored her fibromyalgia diagnosis when determining her restrictions by implying that fibromyalgia can never render an individual disabled. Dkt. No. 20 at 22. But that was not Dr. Weisberg's opinion. In assessing Sieg's fibromyalgia, Dr. Weisberg stated:

> [T]he claimant has routinely seen Dr. Gowing, Rheumatology, for her fibromyalgia and chronic pain. He noted on various visits that her tenderness was in different locations, i.e. shoulders, neck, back, knees etc. Also, though I believe Dr. Gowing is in the minority opinion that an individual should be considered out of work due to Fibromyalgia, the majority of rheumatologist [sic] believe that good sleep hygiene being well hydrated, physical activity which could be physical or aqua therapy along with a routine which should include a regular work routine is a good regimen for those with Fibromyalgia. Her providers' claim of her inability to be physically functional is not justified based on the testing performed as well as exam findings.

AR 400–01. Dr. Weisberg did not disregard Sieg's fibromyalgia or her subjective experience of it. Instead, he found that the testing and exam findings did not support Sieg's providers' conclusions that she was physically incapable of performing any sort of work. Dr. Weisberg's consideration of Sieg's fibromyalgia was not improper. *See Speciale v. Blue Cross & Blue Shield*

13

*Ass'n*, 538 F.3d 615, 622 (7th Cir. 2008) ("Dr. Blonsky did not question that Speciale suffered from fibromyalgia or that she experienced constant pain; rather, he only pointed out the lack of objective evidence supporting Speciale's claim that her pain resulted in severe functional limitations rendering her disabled."). In sum, Dr. Weisberg's report was not conclusory or unsupported.

Although Sieg asserts that she provided Hartford with evidence to support her claim that she was disabled, Hartford ultimately concluded that the evidence did not demonstrate a total inability to work. "[R]eaching a decision amid such conflicting evidence is a question of judgment that should be left to [the administrator] under the arbitrary-and-capricious standard." *Davis*, 444 F.3d at 578. The Court's task is "not to determine if the administrator's decision is correct, but only if it is reasonable." *Id.* at 577. Hartford's decision is rationally supported by the record evidence and was not arbitrary and capricious.

Sieg argues that the employability analysis conducted by the vocational case manager was flawed because it only considered the medical opinions of Hartford's peer reviewing physicians and did not consider any of her medical records, her physicians' assessments, or the other evidence Sieg submitted in support of her claim. Dkt. No. 20 at 25. It is not the role of a vocational case manager, who is not a physician, to analyze medical records, however. The vocational case manager's reliance on Dr. Weisberg's report was not improper.

Sieg asserts that Hartford did not reasonably consider her social security disability insurance award when it evaluated her LTD claim. While a plan administrator is not bound by a social security determination of disability, its "failure to consider the determination in making its own benefit decisions suggests arbitrary decision making." *Holmstrom*, 615 F.3d at 772–73 (citing *Glenn*, 554 U.S. at 118). In this case, Hartford considered the Social Security Administration's

(SSA) disability determination. It explained that Sieg's receipt of benefits under the Plan is determined under a different definition of disability than that used by the SSA. AR 179. Hartford noted that the ALJ's decision "reflects that [Sieg] retains the functional ability to perform at least sedentary work," consistent with Hartford's own determination. *Id.* Indeed, the ALJ found that Sieg had the physical ability to perform sedentary work but concluded that she had functional limitations in her ability to concentrate and adapt based on the psychiatric testing in the record that limited her to unskilled work. AR 414. Based on these functional limitations, a vocational expert determined that no jobs existed for Sieg to perform, resulting in a finding of "disabled" under the SSA's rules. AR 416. Sieg explicitly instructed Hartford, however, that she did "not wish to pursue a claim on the basis of her psychiatric conditions." AR 354. Hartford reasonably determined that Sieg had the physical ability to perform sedentary work.

Finally, Sieg makes a number of procedural challenges to Hartford's determination. She asserts that she was not provided a copy of Dr. Weisberg's report before Hartford issued its adverse benefit determination in accordance with 29 C.F.R. § 2560.503-1(h)(4)(i). Sieg's LTD benefit claim was filed on January 27, 2017, AR 1782, and § 2560.503-1(h)(4) does not apply to claims filed from January 18, 2017, through April 1, 2018. 29 C.F.R. § 2560.503-1(p)(4). Therefore, under the regulations governing Sieg's disability claim, Hartford was not required to provide Sieg with a copy of Dr. Weisberg's report before it issued its determination.

Sieg also argues that Hartford operated under a conflict of interest because it is "responsible for administering LTD claims under the Plan, and it has discretionary authority to determine whether a claimant is entitled to benefits." Dkt. No. 20 at 30. She further asserts that a conflict of interest exists because the benefits under the plan are "fully insured by Hartford." *Id.* The United States Supreme Court has held that a conflict of interest is one factor courts should consider in

15

"determining whether the plan administrator has abused its discretion in denying benefits." *Glenn*, 554 U.S. at 108. The Court noted, however, that the "significance of the factor will depend on the circumstances of the particular case." *Id.* (citation omitted). Where an administrator takes "active steps to reduce potential bias and to promote accuracy," conflicts carry less weight. *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 537, 365 (7th Cir. 2017) (citation omitted). Here, Hartford retained independent physicians to review Sieg's medical record and consulted a vocational case manager to identify the jobs Sieg could perform consistent with her functional limitations. *Id.* There is no evidence that Hartford's determination was influenced by a conflict of interest.

## CONCLUSION

For these reasons, the Court concludes that Hartford did not act arbitrarily and capriciously in denying Sieg's claim for LTD benefits under the Plan. Therefore, Sieg's motion for judgment on the administrative record (Dkt. No. 19) is **DENIED** and this case is **DISMISSED**. With respect to Hartford's request for attorneys' fees pursuant to 29 U.S.C. § 1132(g), the Court notes that a claim for attorneys' fees is to be made by motion within the time allowed under Federal Rule of Civil Procedure 54(d)(2). The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of April, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge